**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TIMOTHY FOSTER,              )
                                     )
                Petitioner,      )
     v.                    )      C.A. No. 09-93 Erie
                                     )      Judge Sean J. McLaughlin
HOLLY R. FOSTER,          )
                                   )
              Respondent.    )

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

### I.  Introduction

Petitioner Timothy Foster ("Petitioner") seeks the return of his son, Isaiah Foster, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, 19 I.L.M. 1501 (1980) (hereinafter the "Hague Convention").  The Hague Convention was codified by the United States Congress in the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq*. Petitioner contends that Respondent, Holly R. Foster ("Respondent"), wrongfully removed Isaiah from Canada without his permission.

### II.  Legal Framework of the Hague Convention

The Hague Convention is a multilateral treaty on parental kidnapping to which the United States and Canada are signatories.  See 53 Fed. Reg. 23834 (listing signatory nations); see generally Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259 (3ʳᵈ Cir. 2007).  The Convention provides a mechanism to ensure the prompt and safe return of children to their habitual residence after they have been wrongfully removed.  The Convention also seeks to secure protection for the "rights of

1

custody and of access under the law" of the habitual residence.  See Hague Convention, Article 1.  "The Convention's procedures are not designed to settle international custody disputes, but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases."  See Karkkainen v. Kovalchuk, 445 F.3d 280, 287 (3rd Cir. 2006).

In order to succeed in a petition seeking return of a child, a petitioner must demonstrate by a preponderance of the evidence that a wrongful removal or retention occurred.   For a removal to be wrongful, a petitioner must establish that: (a) the respondent removed or retained the child from the child's nation of habitual residence, and (b) under the law of the child's nation of habitual residence, the petitioner was exercising parental custody rights over the child at the time of removal or retention, or that he would have exercised said rights but for the removal or retention.  See Hague Convention, Article 3.  See also In re: Application of Ariel Adan, 437 F.3d 381, 390 (3rd Cir. 2006).

Once this standard has been satisfied, the burden shifts to the respondent to demonstrate that the wrongful removal was justified by proving one of the affirmative defenses set forth in Article 13 of the Hague Convention.  Application of Adan, 437 F.3d at 389-90.  If respondent fails to prove any affirmative defense by the requisite standard, the Court must order the prompt return of the child to the country of habitual residence.  Id.

In this case, Respondent does not dispute that Petitioner has established the elements of wrongful removal under Article 3 of the Convention.  The sole focus of this proceeding is whether the "grave risk of harm" defense set forth in Article 13(b) of the Hague Convention operates to

prevent the return of Isaiah to Canada.[1]

Under Article 13(b), a court "is not bound to order the return of the child if . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Baxter v. Baxter, 423 F.3d 363, 373 (3rd Cir. 2005). This exception is to be construed narrowly and requires proof by clear and convincing evidence. Application of Adan, 437 F.3d at 390; 42 U.S.C. § 11603(e)(2)(A).

The United States Department of State has offered the following guidance as to the applicability of this exception:

> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses a child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

51 Fed.Reg. at 10,510. "[T]he meaning attributed to treaty provisions by the government agencies charged with their negotiation and enforcement is entitled to great weight." United States v. Stuart, 489 U.S. 353, 369 (1989).

The Second Circuit has characterized the exception as follows:

> At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's

---

[1]    Respondent had initially raised the additional defenses of acquiescence and wishes of the child, but these were withdrawn following the evidentiary hearing. See Respondent's Post-Hearing Memorandum, p. 20, n. 2.

> preferences; at the other end of the spectrum are those situations in
> which the child faces a real risk of being hurt, physically or
> psychologically, as a result of repatriation. The former do not
> constitute a grave risk of harm under Article 13(b); the latter do.

Blondin v. Dubois, 238 F.3d 153, 162 (2nd Cir. 2001).  Similarly, the Court of Appeals for the First

Circuit had addressed the quantum of proof required by stating:

> To meet her burden under the article 13(b) exception, the respondent
> must establish that the alleged physical or psychological harm is "a
> great deal more than minimal." Indeed, the harm must be "something
> greater than would normally be expected on taking a child away from
> one parent and passing him to another." Courts are not to engage in
> a custody determination or to address such questions as who would
> be the better parent in the long run.

Whallon v. Lynn, 230 F.3d 450, 459 (1st Cir. 2000).  Each of these formulations and examples was

cited favorably by the Third Circuit in Baxter.

Where allegations are made concerning physical abuse, it is axiomatic that the purposes of

the Hague Convention are not furthered "by forcing the return of children who were the direct or

indirect victims of domestic violence."  Simcox v. Simcox, 511 F.3d 594, 604 (6th Cir. 2007).

Moreover, the Third Circuit has acknowledged that evidence of a petitioner's abuse of his spouse

is "relevant to the District Court's determination of whether returning [the child] would expose the

child to a grave risk of harm."  Application of Adan, 437 F.3d at 396 n. 6.  The Sixth Circuit has

noted, however, that "the more difficult question is at precisely what level . . . the risk to the child

is grave, not merely serious."  Id.

In Simcox, the Court illustrated the distinction between grave and serious risk of harm by

articulating three broad categories into which an abusive situation might fall.  On the one end of the

spectrum, the Court noted situations where "the abuse is relatively minor."  Id. at 607.  For example,

courts have held that "two incidents" of a mother striking two of her four children and a generally chaotic home environment did not establish a "sustained pattern of physical abuse." McManus v. McManus, 354 F.Supp.2d 62, 69-70 (D. Mass. 2005). Similarly, in Whallon, the First Circuit held that a husband's verbal abuse and an incident of shoving directed towards his wife, "while regrettable, was insufficient to establish a grave risk of harm to the child." Simcox, 511 F.3d at 609 (citing Whallon, 230 F.3d at 460). An abusive situation is less likely to be considered "grave" where the allegations of abuse concern "isolated or sporadic incidents." Id. at 608.

On the opposite end of the spectrum are cases in which "the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." Id. at 607-08. In Van De Sande v. Van De Sande, 431 F.3d 567, 570 (7th Cir. 2005), the Seventh Circuit reversed an order to return children to a petitioner who had "beat[en] his wife severely and repeatedly in [the children's] presence" and threatened to kill them. Similarly, in Walsh v. Walsh, 221 F.3d 204, 219-20 (1st Cir. 2000), the court reversed an order of return after finding that the father was "psychologically abusive" and had severely beaten the children's mother in their presence. See also Rodriguez v. Rodriguez, 33 F.Supp.2d 456, 459-60 (D. Md. 1999) (refusing return where child had been belt-whipped, punched and kicked, and where the child's mother had been subjected to serious attacks resulting in a broken nose and choking).

The third category of cases described by the Sixth Circuit concerned those that "fall somewhere in the middle," where the abuse is "substantially more than minor, but is less obviously intolerable." Id. at 608. Applying the grave risk of harm analysis to such situations is "a fact-intensive inquiry that depends on careful consideration of several factors, including the nature and

frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." Id.  In evaluating the allegations, a court must "consider the totality of circumstances related to the alleged child abuse, rather than simply considering and explaining away each allegation in isolation." Application of Adan, 437 F.3d at 398.

In Simcox, the Court characterized the case as being "admittedly a close question," and presenting "difficult, middle-of the road facts." Id. at 609.  The evidence portrayed the petitioner as "both verbally and physically violent with his wife and children." Id. at 608.  Examples of abusive behavior included allegations that he would call the children's mother a "f–ing bitch," "grab her jaw and put his finger on her neck, pulling hair," and that he once "banged her . . . head against the passenger window of the vehicle in which they were traveling." Id. at 599-600.  The children had witnessed numerous instances where the petitioner struck respondent and "recounted frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and of pulling their hair and ears." Id.  After concluding that the abuse alleged was "serious" in nature, occurred with "extreme frequency," and was likely to "occur again without sufficient protection," the Court concluded that a grave risk of harm had been established.  Id. at 608.

Finally, if a respondent is able to produce clear and convincing evidence of a grave risk of harm to the child, she must then demonstrate that "the court[s] in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." Application of Adan, 437 F.3d at 395 (citing Blondin, 238 F.3d at 162).  As such, the court must consider the "protective efficacy of the [foreign nation's] courts and police" and carefully determine whether an order might be tailored "to ameliorate, as much as possible, any risk to [the child's] well-

being." Id.

### III.  Findings of Fact

The following represent the Court's Findings of Fact based on the testimony and exhibits received into evidence at the hearings conducted on June 4 and 5, 2009 and July 21, 2009.[2]

The Fosters were married on November 26, 1988 in Florida.  They lived there for approximately ten years before moving to Canada in 1998 and ultimately settling in Val des Monts, Quebec.  (Evidentiary Hearing Transcript, 6/4/09, p. 11).[3]  A mutual friend of the Fosters who was pregnant contacted them about adopting her child and the Fosters agreed to do so.  (Transcript, p. 14).  Isaiah was born in Canada on October 28, 2000 and was subsequently legally adopted by the Fosters.  Both Fosters were present at Isaiah's birth.  (Transcript, 6/4/09, p. 15).

Respondent testified, in essence, that from early on in the marriage Petitioner was verbally abusive.  While she denied any physical abuse while in Florida, she testified that her husband would frequently call her an idiot or other degrading names.  (Transcript, 6/4/09, p. 9).  The verbal abuse became more severe while awaiting Isaiah's birth.  Petitioner would frequently scream at her and chastise her for not behaving like a "Proverbs 31 wife" - a contention that she was not appropriately deferential or submissive to him.  (Transcript, 6/4/09, pp. 16-17, 19).

Respondent testified that the first instance of physical abuse occurred when Isaiah was an

---

[2]     The delay between the hearing of June 4-5, 2009 and July 21, 2009, was occasioned, in part, by the Court's suggestion, with which the parties agreed, to attempt to amicably resolve the matter so that Isaiah would not have to be subjected to an *in camera* examination by the Court.  Unfortunately, settlement efforts proved futile.

[3]     Hereinafter, references to testimony given at the evidentiary hearing will be in the following format: (Transcript, MM/DD/YY, p. X).

infant.  An argument ensued when her husband told her he had been out drinking with an old girlfriend.  Matters apparently escalated to the point where he threw her on the bed and squeezed her head.  (Transcript, 6/4/09, p. 18).  The other incident of physical abuse directed toward Respondent occurred a number of years later, when Isaiah was approximately six years old.  Petitioner and Respondent had become involved in an argument while driving home.  Isaiah became upset and Respondent was comforting him upstairs in her bedroom after they got home.  She testified that Petitioner came in, grabbed her by the arm and pushed her through a doorway, causing her to fall.  (Transcript, 6/4/09, p.21).

Respondent testified in some detail as to the nature of Petitioner's interaction with his son.  She had observed that her husband on occasion, when displeased with something Isaiah was doing, would smack him on the head.  (Transcript, 6/4/09, p. 27).  If Isaiah fell short of his father's expectations, such as an inability to perform a bike trick, he would call him a "wuss" or a "wimp."  This conduct occurred periodically since Isaiah turned five.  (Transcript, 6/4/09, p.22).  In the spring of 2008, Isaiah complained to her that his dad had pulled his hair.  (Transcript, 6/4/09, p 23).  She also recalled that Petitioner had spanked Isaiah on approximately four occasions with a wooden spoon.[4]  (Transcript, 6/4/09, p. 28).  She relayed an incident where Petitioner had taken Isaiah to a ski resort and, as a result of Petitioner's inattention, Isaiah had ridden up on a ski lift by himself and, rather than debarking at the top, rode the lift back down.  (Transcript, 6/4/09, pp. 57-58).  She observed that Isaiah was quite upset by the incident.  Finally, she recalled an incident where Isaiah became quite frightened when his father poured gasoline on a campfire that they had built on their driveway.  (Transcript, 6/4/09, p. 25).

---

[4]        I find, as a matter of fact, that the spoons were plastic rather than wooden.

8

As a result of what she perceived to be an untenable domestic situation, she told her husband in mid-July of 2009 that she was picking up Isaiah from baseball practice. In fact, at that point, she and Isaiah went to a shelter for abused women. (Transcript, 6/4/09, p. 28). An immigration lawyer advised her at that time that she should leave the country with her son. Thereafter, she and Isaiah traveled to Warren, Pennsylvania, and took up residence with Respondent's parents. (Transcript, 6/4/09, p. 30).

After arriving in Warren with Isaiah, Respondent began corresponding regularly over the phone and by email with Petitioner's sister, Stefanie, and father, Anthony. (Transcript, 6/4/09, p. 30). The emails from Stefanie reflect that both she and her father intended to keep Respondent's location a secret from Petitioner at that time because of fears for Respondent's safety. Stefanie indicated that she would warn Respondent in advance "if Tim decides to come and find you . . .". (Transcript, 6/4/09, p. 37; Defendant's Exhibit B). Respondent testified that she in turn feared for Stefanie and Anthony's safety if Petitioner were to discover that they had been assisting her, particularly as she had observed Petitioner in a physical altercation with his father in the past. (Transcript, 6/4/09, p. 39-40).

For a brief period of time after arriving in Warren, Mr. and Respondent engaged in discussions about trying to resolve the custody issue. (Transcript, 6/4/09, p. 44). A Custody Agreement was prepared on behalf of Respondent by a Warren attorney and was forwarded to Petitioner. (Transcript, 6/4/09, p. 45; Defendant's Exhibit H). Petitioner initially voiced no objection to the Custody Agreement, but the document was never executed. (Transcript, 6/4/09, pp. 50, 77; Defendant's Exhibit I).

In the fall of 2008, Respondent met a man on an internet site for single parents with children.

9

(Transcript, 6/4/09, p. 69).  He flew to Warren to meet her and she subsequently flew to California with Isaiah to spend some time with him.  (Id.)  Representations made by the individual proved not to be truthful and before returning to Warren, Respondent called Petitioner and asked if she could return to Canada.  (Transcript, 6/4/09, pp. 81-82).

Annette Wilkins, a children's advocate at a domestic abuse center in Warren, was called on behalf of Respondent.  She had the occasion to periodically interview Isaiah between October 1, 2008 and May 27, 2009.  She had served as a children's advocate for approximately eight years.  (Transcript, 6/4/09, p. 84).  She reported that Isaiah had informed her that his father was "mean", had hit him with a spoon, and had scared him when he poured gasoline on a fire.  (Transcript, 6/4/09, p. 86).  He also referenced that his father had pulled his hair when he was in kindergarten and pushed his mom down and made her fall.  (Transcript, 6/4/09, pp. 89, 92).

Karen Greto, Isaiah's second grade teacher, testified that when Isaiah first arrived in class, he had difficulty interacting with his fellow students.  (Transcript, 6/4/09, p. 102).  She indicated that, as time progressed, he became more comfortable with other children.  (Transcript, 6/4/09, pp. 104-05).  She relayed an incident where a number of children whose parents were separated expressed the sentiment that they wished their parents lived together.  Isaiah raised his hand and told her that he didn't want his dad in his neighborhood.  (Transcript, 6/4/09, p. 108).  Isaiah told her that he feared his father and she concluded that his feelings were genuine rather than the product of coaching by his mother.  (Transcript, 6/4/09, pp. 106-07, 110-11).

Timothy Foster testified that he was ordained a minister in 1991 and served for a period as director for Fellowship for Christian Athletes.  (Transcript, 6/4/09, p. 121).  He currently resides with his girlfriend and her children and splits his time between her residence and his residence in Val des

Monts.   (Transcript, 6/4/09, pp. 121, 181-82).   He relayed in great detail his athletic accomplishments, including his membership on the Canadian National Ski Team and an appearance on the Wide World of Sports. (Transcript, 6/4/09, pp. 126, 163).   He denied that he had ever been physically abusive to his wife. (Transcript, 6/4/09, pp. 130-32).   I do not credit that testimony.   I find, as relayed by Respondent, that he did intentionally push her in the bathroom doorway causing her to fall to the ground.   In fact, Petitioner admits that he ran into her but essentially blamed the contact on her because she didn't move.   (Transcript, 6/4/09, pp. 131-32).   As previously indicated, I also find that he squeezed her head in the manner described by Respondent.

Petitioner testified that on two occasions he disciplined Isaiah by spanking him on his rear end with a plastic spoon.   (Transcript, 6/4/09, pp. 137-38).   He attributed the spanking to punishing Isaiah for accidentally dropping hot embers on the floor and engaging in other dangerous behavior. There is some dispute as to the number of spankings but I find that it is most likely that Isaiah was spanked two to four times.   The spankings were no doubt painful because, as Petitioner described it, "if there were red marks and he couldn't sit down afterwards, that's the whole point." (Transcript, 6/4/09, pp. 137-38).   With respect to the gasoline incident, he claimed that he only poured gas on the fire because the logs were wet and it had been raining.   (Transcript, 6/4/09, p. 139).   To the extent that Isaiah was shaken by the incident, he attributed it to an earlier incident when he had removed Isaiah from a docked powerboat just moments before it exploded and burst into flames.   (Transcript, 6/4/09, pp. 140-41).   I note, parenthetically, that it does appear that the child was frightened for a brief period of time as a result of Petitioner's actions in pouring gasoline on the fire but that it is at least probable that some of the child's concern was driven by the previous boating incident.

An email, Defendant's Exhibit J, was introduced into evidence which represented a series

11

of several complaints or grievances by Isaiah of mistreatment by his father and his father's response

to each.  In this respect, it is useful to quote verbatim from portions of the email where Petitioner

addresses certain of his son's complaints concerning his parenting:

> 1) you pulled my hair hard
>
> I'm not sure what scenario this was in but it certainly wasn't intentional or in ant [sic] attempt to hurt you - I would never do that ZaZa.  Were we wrestling and your hair got pulled? (I know how extra sensitive it is, just like Mommy's) But that you have some memory of your hair being pulled, I'm sorry.  Again what ever happened was not intentional but I'm sorry that you thought it was.
>
> \*       \*       \*       \*       \*       \*
>
> 3) you pushed Mommy down and made her cry
>
> Unfortunately, there were many things that both Mommy and Daddy did to each other that made us both cry.  In fact, most mornings over the last several years, after you went to school, Mom would tell Daddy very hurtful things that made Daddy just sit at his desk and cry.  Mommy was hurt and angry and was unable to deal with her feelings other than being disrespectful and hurtful towards Daddy. Just like the situation I think you're speaking of, when I was in your bedroom, and Mommy was speaking to Daddy in front of you in a way she shouldn't have, that made Daddy very angry.  When I couldn't take anymore I stormed out of the room and Mommy, still being defiant and disrespectful just stood in my way.  I didn't stop and put my hand up in front of my (otherwise we would have hit heads) and kept walking.  Should I have stopped and asked her politely to get out of the way - yes.  Did I - no.  Should she have spoken to me that way in front of you and blocked my way - no. Again, it was a very very bad situation for Mom and Dad and I apologize for you having to see and experience any of it.
>
> 4) you slapped the back of my head hard when you were mad at me
>
> As was the case above, Mommy was in the habit of being disrespectful to Daddy, often in front of you, as a result and as a way to get back at Daddy for not being affectionate and loving as a husband is supposed to be towards his wife.  As a result, you at times,

12

were also rude and disrespectful.  I'm not sure what you did or said that prompted me to slap the back or your head, but I'm sorry.  If you had done something to deserve a spanking, it should have been done according to the Bible with something other than my hand.  If it's any encouragement at all, your older now and can better understand reason, so your days of spankings and slaps are over.  Again, the tension and built up frustration, angry and depression was building in both Mommy and Daddy because they were so unhappy living together that there were times that those unpleasant emotions spilled out in how we behaved and spoke to you.  And for that, I will always be sorry and wish I could make all you [sic] unhappy memories go away.

*     *     *     *     *     *

6) you made me do stuff on my bike that scared me and told me not to be a wimp

It's a Dad's job to encourage and challenge their kids to be the smartest, fastest, bravest, kindest, strongest, etc boy or girl they can be.  Moms tend to make sure that the kids know that they don't have to do anything they don't want to.  I know your abilities and was only challenging you to push yourself even if you didn't think or believe you could do it - I believed in you and always will - and knew you could do everything I ever challenged you to do.  And I would today, still encourage and challenge you to push yourself to go beyond where you think your limits are - because you will often be capable of far more that [sic] you may think.  And as far as a wimp is concerned - you skied off jumps (in fact I couldn't get you to just ski down a hill you loved going off those jumps so much), you did a triathlon when you were just 5, you went 30 plus mph on a go cart and would have stayed there all day if you could have, you swam under water, you got right back up when you skid on your bike when you forgot to turn slowly as I told you if there were pebbles on the driveway or road, you kept playing baseball even though when learning to catch you missed the ball and it hit your head, and many many more examples of you being anything but a wimp.  Because you're not Isaiah.  You're the greatest Son in the world, and if there's one thing you're not - it's a wimp.  And I'm very very proud of you.

7) you left me alone at Edelweiss and I had to come down all by myself.

13

After we skied for a while on the big hills, you insisted that you wanted to just stay and play on the Bunny hill.  You had some kids there that you had skied with earlier and you promised me that you would stay there while I took a run down the big hill.  That I would come right back to see you, and if you wanted to stay there fine, if not you could again come with me.  But instead of staying on the bunny hill, you broke your promise and did not do what you said you would do - you left the bunny hill before I got back and got in the line for the big hill.  If the tow attendants asked you if you could go up by yourself, you told them you could - even though you had never been on a chairlift alone - and you hopped on the chair.  (Again proving you are no wimp).  Unfortunately you got scared and did not get off at the top and had to ride all the way back down.  If you remember, I was furious with the attendants and yelled at them for allowing you on the chair, and they told me how well you had skied up to the chair and that smaller kids than you rode the chair everyday all day by themselves.  I didn't leave you alone no more than Mommy leaves you alone to play outside - and you have promised not to walk down to the highway nor walk to your current school by yourself.  If you get up and leave and then get scared on the highway - is it Mom's fault that you didn't do as she expected and as you had promised - or is it your fault.  Should Mom have to stay and watch you play outside or should she be able to trust you to stay in the yard?!  You disobeyed and got into to [sic] trouble - that's what happens when you don't listen to Dad and don't do what you promise.

*      *      *      *      *      *

9) you called me names - crybaby, wimp, little girl

Again, I'm not sure what the context was, but I know that we were either playing and teasing each other, or I challenging you and encouraging you to be courageous - at a little boys level.  And I know that if you were upset, sometime during the day, and certainly every night when I tucked you in bed to say good night, I would always tell you how much I loved you, and often how proud I was of you for something you did during the day.  Isaiah, there is no prouder Dad in the world that [sic] I am of you.

10) when you made a big fire and then poured more gas on it and made it go really high

Mommy mentioned this also, which makes me think she may have

14

been sick that night and for some reason exaggerated the reality of what happened.  But regardless, after I put some gas on the wet logs that were not burning, and made sure everyone stood well back before lighting it - we all sat down for an hour plus roasting marsh mellows over the fire.  So what ever was "so scary" sure ended within a [sic] 20 seconds or so because that's how long it was before you sat do [sic] on the logs and started cooking.

11) you spanked me so hard that I couldn't sit down

When you hurt / hit / intentionally caused pain to someone else, were endangering your own safety (playing with the wood stove) or were grossly rude and disrespectful to Mommy - you got a spanking.  I believe you got 2 over 3 years.  What you don't know, that I guess you should, is that if it was up to Mommy, I would have spanked you several times a week.  She didn't, and still may not, acknowledge her disrespectful and rude way she spoke and treated me in front of you.  As a result, since you knew that Mommy was supposed to do what I asked, and that you were supposed to do what Mommy asked - that you were learning from Mommy's behavior towards me that is [sic] was okay to be disrespectful and disobedient - and you were many many times towards Mommy.  To the point where she would tell me repeatedly how her Dad (Pops) would hold Uncle Ted up against the wall with his feet suspended in the air - his hands under Teds chin and around his neck - when he was disrespectful to Mima.  And was furious that I didn't discipline (spank you) on a regular basis because of the way you spoke to Mom.  Well I wouldn't do it because it wasn't fair to you.  You were being shown one thing and just did as you were shown.  So be thankful, that I choose to be miserable and have your Mother be rude and disrespectful to be [sic] instead (that's why I cried so often in the office, all the mean things Mom used to say to me) of spanking you as she wanted.

12) I saw you push Skyler into the door and then said that you didn't.  I was there and I saw you.

You and Skyler were playing like hooligans in the automatic sliding door at Marche Richelieu while I was talking with Stef.  When I turned around, Stef and I were 15 feet in the store, wondering what all the noise was, I saw people having to move out of the way so they wouldn't be hit by you or Skyler.  But to your credit, you were inside the entry way watching Skyler play with the door - but you being a nuisance also.  I was both embarrassed and angry.  Just the day before

15

you both were being anything but well behaved at the movie theater and were put in time out - and now you're both causing trouble again. When I marched over to the door to reprimand you both, you were further inside and Skyler was just inside the store but very close to the doorway.   (The door was in the open position).   After my initial speech, bent over starring [sic] at Skyler, I placed my hand on Skyler's shoulder, turned him to walk out to the truck and started walking forward.   Well, looking down at him I didn't see the door began closing and walked him right into the door with my hand still on his shoulder directing him to the outside door.   So it probably did look like I pushed him into the door, but it was an accident and certainly not intentional.   So no, I didn't intentionally push a little boy into a sliding door, but yes as I began to walk forward with my hand on his shoulder just beginning to stand up and not seeing that the door had closed - I walked him into the door, stopped immediately, asked him if he was okay, he said yes - and as you should also remember, I then walked you both out to the truck, where you waited until Stef and I were done shopping.

*       *       *       *       *       *

14) you told me Mommy wasn't going to heaven and I wouldn't miss her

I would never say anyone isn't going to heaven, only Jesus knows that.   However, I have and will continue to observe ungodly behavior (that we're all guilty of from time to time) by anyone and comment, based on the applicable scripture, that the person needs to repent and / or is not acting and / or speaking like someone who claims they are a born-again child of God who will be in heaven.

(Defendant's Exhibit J)

A series of affidavits were introduced into evidence by Petitioner from: his sister, Stefanie; his father, Anthony; his girlfriend, Sarah Bellerive; and a friend of both his and Respondent's, Shawn Sauve.   (Transcript, 6/4/09, pp. 165-68).   In each, the affiant indicated, in essence, that they had never observed inappropriate behavior from Petitioner in his dealings with his son and his wife. They portrayed him as a loving husband and father.   The affidavits of Stefanie and Anthony are

16

inconsistent with the emails sent by them when they initially corresponded with Respondent and voiced concerns about Petitioner's behavior.  Given the previous emails and the fact that Petitioner was instrumental in procuring the affidavits, I give the affidavits little weight.

On July 21, 2009, the Court conducted an *in camera* examination of Isaiah Foster. The only other person present was my law clerk.  The purpose of the interview was to determine whether Isaiah was sufficiently mature such that his opinion as to where he would like to live should be taken into account.

As the record reflects, we discussed a wide variety of subjects, including his performance in school, sports activities, his friends, and his new pet. (Transcript, 7/21/09, pp. 12-15, 17).  I found Isaiah to be a bright little boy who patiently answered my questions.  His responses appeared to be genuine and non-rehearsed.  I did not detect any evidence of coaching or undue influence.

He indicated that he enjoyed school in Warren and the new friends he had made there.  He also stated that he missed his friends in Canada.  However, he denied that he missed his father because, in Isaiah's words, his father "had been mean to us," and he "wanted it to stop." (Transcript, 7/21/09, p. 19).

At the conclusion of the interview I asked him whether he would rather live in Warren or in Canada.  At that point, he became tearful and responded that he would rather live in Warren because, in his words, "I am able to see my pet, if I go back to Canada, I can't see her again."   (Transcript, 7/21/09, p. 20).  Shortly thereafter, I concluded the interview.

Finally, Dr. Steven Neuhaus was called by Respondent.  The Court recognized him as an expert in the field of clinical and forensic psychology. (Transcript, 7/21/09, p. 25).  Dr. Neuhaus testified that Respondent had given him some history concerning the domestic problems between

she and her husband and also informed him that Isaiah was fearful of his father and of returning to Canada. (Transcript, 7/21/09, p. 27). He subsequently performed a clinical interview of Isaiah out of his mother's presence. He found Isaiah in many ways to be a typical eight year old boy. He concluded that he had "good psychological defenses" despite the many pressures to which he had been subjected. (Transcript, 7/21/09, p. 31)

Isaiah told him that his father could be mean and that he was fearful of him. (Transcript, 7/21/09, p. 33). By way of example, Isaiah relayed that his father "yelled at people" and had made Isaiah's grandmother cry. (Id.) Dr. Neuhaus described the interview as "flowing and seamless" and concluded that Isaiah was able to maintain some "balance in his life." (Transcript, 7/21/09, pp. 35-36).

Dr. Neuhaus administered a test to Isaiah known as the Trauma Symptoms Checklist for Children. (Transcript, 7/21/09, p. 36). Although he found a slight elevation on the validity scale relative to hyper-responsiveness or exaggeration, he did not find it to be so elevated as to be statistically significant. (Transcript, 7/21/09, p. 40). Isaiah scored a 78, with 90 being indicative of excessively endorsing symptoms. (Transcript, 7/21/09, p. 42). Slight elevations were detected in those scales relative to depression, post traumatic stress disorder, and disassociation. Dr. Neuhaus concluded, however, that he did not observe a clinically depressed child who was suicidal, nor did he find the child, based on his interview, to be suffering from post-traumatic stress disorder. (Transcript, 7/21/09, pp. 44-45). He concluded that Isaiah was "a delightful little boy who is in many ways getting on with his life." (Transcript, 7/21/09, p. 46). With respect to the slight elevation on the disassociational score, Dr. Neuhaus concluded that it was attributed to Isaiah attempting to disassociate himself from fears of his father. (Transcript, 7/21/09, p. 48). Dr. Neuhaus was asked

the following questions concerning the nature and likelihood of Isaiah suffering harm if he were to

be returned to Canada:

> Q:   Do [you] have an opinion as to whether or not Isaiah will likely suffer psychological harm if he is ordered to return to Canada?

> A:   Let me initially say prediction is – is a tough ball to look into. I am asked to anticipate the future sometimes.  I with both tongue in my cheek will say that my crystal ball sometimes has a cataract.  But at the same time, I will look to risk factors and things to watch out for.  That's why in my report I put down based on what was available to me, interviews with him, his mom, collateral records, I had concerns and do have concerns about Isaiah's emotional well-being if he had to return to Canada and if he had to return to Canada without his mother.

> \*      \*      \*      \*      \*      \*      \*      \*

> Q:   Dr. Neuhaus, do you have [sic] an opinion within a reasonable degree of psychological certainty as to whether or not forcing Isaiah to return to Canada would pose a serious risk of psychological harm to Isaiah?

> A:   Based on the totality of what I've seen, the testing, his presentation, his comments to me, the way he sort of has structured his coping and survival strategies, yes, I do have concerns.  As careful as I want to be about it, I really have some significant concerns about burdens and the risks for this eight-year-old.

(Transcript, 7/21/09, p. 56).

Subsequently, the Court asked a series of similar questions and received the following

responses:

> Q:   In your report at the last page you say "I would offer my opinion based on a reasonable scientific certainty and the information currently available that a return to Canada is potentially perilous if not potentially harmful."  Is it accurate

19

> to say that that's another way of saying to a [sic] reasonable degree of psychiatric or psychological certainty, the possibility exists of potentially serious harm?
>
> A:  Yes, your Honor.
>
> Q:  All right.  As opposed to saying to a reasonable degree of psychiatric certainty the child will suffer significant harm?
>
> A:  I think it would be inappropriate to go there, I couldn't go there.

(Transcript, 7/21/09, p. 75).

> Q:  But on the question of your ability in any given case to opine on the likelihood of let's say future psychiatric or psychological harm, the likelihood of a grave risk of psychological harm if a given child is returned to a certain domestic setting, would your ability to predict a greater likelihood of psychological harm increase depending upon the underlying severity of, for instance, sexual abuse or extreme physical abuse?
>
> A:  Certainly.  If I and I have your Honor, had a good sense that we were returning somebody, a child to a monster or a monstrous setting, of course I would be in a better position to predict that.  I've seen those kids at the extreme end of the spectrum whose parents lose all of their parental rights because they are so inadequate or evil.  The difficulty in these kinds of situations is sometimes we're dealing with more subtlety and higher degrees of socialization to mask the problem.  But I'm just saying, you know, I don't believe for Isaiah this is sort of a made up bogeyman, either.

(Transcript, 7/21/09, pp. 76-77).

## IV.  Analysis

As previously discussed, I find that Petitioner has been verbally abusive to Respondent over the last several years of their marriage and has, on at least two occasions, been physically abusive. He is overbearing, egotistical, hot-tempered, and appears to possess little or no capacity to take any

20

personal responsibility for the present domestic situation.

With respect to the nature of his interaction with Isaiah, I find Petitioner to be domineering, excessively demanding and impatient.  As a result of his own egocentrism and lack of sensitivity, he insisted on a performance level from his son that was simply unattainable.  In many ways, he treated his son like a fellow world class athlete and made no allowances for the fears and limitations of an eight-year-old boy.

Petitioner's parenting skills and approach undeniably leave much to be desired.  However, I find that Respondent has failed to demonstrate by the clear and convincing standard that Isaiah would be subjected to a grave risk of physical harm if he were returned to Canada.  The spankings, name-calling and physical discipline described by Respondent are more akin to the "isolated and sporadic" abuse presented in McManus and Whallon that, "while regrettable, w[ere] insufficient to establish a grave risk of harm to the child," than to the pervasive, severe, and dangerous behavior described in Van De Sande, Walsh and Rodriguez.  See Simcox, 511 F.3d at 609 (citing Whallon, 230 F.3d at 460; McManus, 354 F.Supp.2d at 69-70; Van De Sande, 431 F.3d at 570;  Walsh, 221 F.3d at 219-20; Rodriguez, 33 F.Supp.2d at 459-60).  Indeed, the evidence of abuse here falls short even of that described in Simcox, a case which the Sixth Circuit categorized as "admittedly a close question."  Simcox, 511 F.3d at 609.

Nor do I find that Respondent has demonstrated by clear and convincing evidence that Isaiah would face a grave risk of psychological harm if ordered to return to Canada.  I have carefully considered the testimony of Dr. Neuhaus, who I found to be very professional, thorough and completely principled in the performance of his expert duties.  Respondent contends that she has met her burden of proof based in large part on the testimony of Dr. Neuhaus and relies, in part, on

Blondin v. DuBois.  Respondent notes that, in Blondin, the Court observed that, "Blondin did not present any evidence as to the psychological impact that a return to France would have on the children.  We are thus presented with a rare situation in which . . . no evidence was presented by one party that would contradict the conclusions of an expert procured by the opposing party."  See Blondin, 238 F.3d at 160.

In Blondin, the facts demonstrated that the petitioner had repeatedly and severely beaten respondent, both with his fists and a belt, in the presence of the children at issue.  He had also frequently abused one of the children.  Based on those facts, a psychologist procured by the respondent was able to confidently and conclusively articulate that the children would "almost certainly suffer a recurrence of their traumatic stress disorder . . . that would impair their physical, emotional, intellectual and social development" if they were returned to the abusive parent.  Blondin, 238 F.3d at 160.  In contrast, Dr. Neuhaus emphasized in his testimony that he was reluctant and unable to predict grave psychological harm with any degree of psychological certainty.  Indeed, as reflected in the excerpted portions of his testimony, his ability to do so would have been greater if, as he explained, Isaiah had been subjected to more serious physical or psychological abuse.  Dr. Neuhaus also implied that his concerns regarding harm to Isaiah might be less acute if Respondent were to accompany his return to Canada.  (Transcript, 7/21/09, p. 52)  I also find it significant in the grave risk of harm calculus that Dr. Neuhaus found Isaiah to possess good coping skills.

It is important to stress that, under the Hague Convention, I am not charged here with resolving issues germane to a custody dispute.  If I were, this would be in basketball parlance, a "slam dunk."  But issues of custody are for the Canadian courts, where custody proceedings have already been instituted by Respondent.  I am constrained to conclude that Respondent has failed to

demonstrate by clear and convincing evidence that Isaiah would be subjected to a grave risk of physical or psychological harm if returned to Canada.  Further, no evidence has been produced, as required by Third Circuit precedent, that the Canadian judiciary or other appropriate Canadian authorities are "incapable or unwilling to give the child adequate protection."  <u>Application of Adan</u>, 437 F.3d at 395.

### V.  Conclusion

For the reasons set forth above, I find that Respondent has failed to meet the high burden of demonstrating the likelihood of a grave risk of psychological harm by clear and convincing evidence and the inability of Canadian courts and authorities to protect Isaiah's well-being.  As such, the Petition for Return of a Minor Child to Canada Pursuant to the Hague Convention is granted.

The Third Circuit has instructed that an order requiring the return of a child to a foreign jurisdiction pursuant to the Hague Convention "requires careful tailoring to ameliorate any risk of harm to [the child] that may result from granting the petition and a consideration of alternative arrangements that will safeguard her well-being pending effective action by [foreign] authorities." <u>Application of Adan</u>, 437 F.3d at 397.  Specifically, the order must indicate "in whose custody [the child] should be returned [and] what actions should be taken to assure that [the child] is safe."  <u>Id</u>. at 398.

With these principles in mind, and pursuant to this Court's authority under 42 U.S.C. § 11603(a), it is hereby ordered that:

> (1) Isaiah Foster shall be returned in the company of Respondent to Canada within 20 days of this order;
>
> (2) In an email dated July 27, 2009, Petitioner indicated that "there are still people here that are willing to provide you room and board

until you get your visa." <u>See</u> Defendant's Exhibit P.  If Respondent so desires, Petitioner is ordered to assist in finding room and board for Respondent and Isaiah as offered in his email or to pay for suitable room and board until ordered otherwise by the Canadian courts.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY FOSTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | C.A. No. 09-93 Erie |
| | ) | Judge Sean J. McLaughlin |
| HOLLY R. FOSTER, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER**

AND NOW, this 4th day of September, 2009, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Petitioner for Return of Minor Child to Canada Pursuant to the Hague Convention is GRANTED.  It is FURTHER ORDERED that:

(1) Isaiah Foster shall be returned in the company of Respondent to Canada within 20 days of this order;

(2) In an email dated July 27, 2009, Petitioner indicated that "there are still people here that are willing to provide you room and board until you get your visa."  See Defendant's Exhibit P.  If Respondent so desires, Petitioner is ordered to assist in finding room and board for Respondent and Isaiah as offered in his email or to pay for suitable room and board until ordered otherwise by the Canadian courts.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___

25